37 Cal.App.2d Supp. 765 (1940)
STATE BONDED AUDIT BUREAU, INC. (a Corporation), Appellant,
v.
POMONA MUTUAL BUILDING AND LOAN ASSOCIATION (a Building and Loan Association), Respondent.
California Court of Appeals. 
January 30, 1940.
 Franz R. Sachse and John C. Campbell for Appellant.
 Allard, Whyte & Brownsberger for Respondent.
 Schauer, J.
 This is an appeal by plaintiff from a judgment for defendant in an action by the assignee of a depositor in a building and loan association to recover from the association a sum equal to the difference between interest on his deposits at the rate called for by his certificates and the interest actually paid him at a lesser rate pursuant to a statute enacted during a period of national emergency. The certificates involved herein were all issued prior to March 10, 1933, and each declares that the "principal sum shall bear dividends from the date of issue hereof, at the rate of Six Per Cent (6%), per annum, payable Quarterly". [37 Cal.App.2d Supp. 767]
 On March 10, 1933, there became effective the provisions of section 8.09 of the Building and Loan Association Act. (Act 986, Deering's Gen. Laws, 1933 Supp.) By the terms of that section "Notwithstanding anything to the contrary contained in this Act or in any investment certificate or certificate evidencing shares or in any agreement or elsewhere, no association shall hereafter at any time pay, credit, declare or allow any interest, or dividends in excess of the rate of four per cent per year in respect of interest or dividends which shall accrue or be earned during the emergency period (but only during such period) as hereinafter in this section 8.09 defined, upon investment certificates or shares, whether heretofore or hereafter issued. ... The commissioner is hereby authorized, however, during such emergency period, in the case of any or all associations, to increase such rate to a rate not in excess of five per cent per year, or to decrease such rate or to postpone the time for the payment of such interest or dividends, or any part thereof, or to decrease such rate and to postpone such time of payment, if he shall determine that such increase is reasonably justified in the interest of the certificate holder or shareholders, or is in the public interest, or that such decrease or postponement, or decrease and postponement, is reasonably necessary for the protection of the investment in such association of its certificate holders or shareholders, or is in the public interest." [1] The term "emergency period" as used in the section is defined as the period commencing with the effective date of such section (March 10, 1933) and ending September 1, 1935, unless sooner terminated by order of the commissioner as provided for therein. The amendatory act of March 10, 1933, also declared (sec. 10) the intention of the legislature to enact each portion of such act regardless of the constitutionality of any other portion thereof, that it was acting (sec. 11) under "the police powers of this State in view of the existing emergency", declared the act to be (sec. 12) an urgency measure and stated various "facts constituting such necessity." The facts so stated are ample, prima facie, to constitute a basis for emergency exercise of police powers. In 1935, prior to September 1st, another declaration of public emergency and necessity was made and the period of the emergency was extended to February 1, 1937 (likewise as the former subject to sooner legal termination by the Building [37 Cal.App.2d Supp. 768] and Loan Commissioner). Said section 8.09 requires the giving of a five days' notice of any change of interest or dividend rate and contains other provisions which are immaterial to our decision.
 Obediently to the directions of the statute, defendant building and loan association subsequent to March 10, 1933, and up to January 26, 1937, when the principal of the certificates was retired by payment in full, paid interest at the reduced rate of 4 per cent per year, except for the period between April 2, 1934, and January 2, 1935, when the rate by order of the commissioner, validly and regularly made if the statute is valid, was 2 per cent per year. It is to recover the difference between the interest so paid and that which would have accrued at 6 per cent per year that this action is brought. The judgment for defendant must be affirmed.
 [2] Appellant frankly and commendably concedes that respondent "aptly and succinctly" stated the latter's position in its brief as follows: "The major premise is that, notwithstanding the constitutional provisions against laws impairing the obligation of contracts, the states, through their legislative bodies may, in the exercise of the police power, pass laws reasonably regulating businesses 'affected with the public interest'. The minor premise is that the business of a building and loan association is a business 'affected with the public interest'. The conclusion follows that section 8.09, if reasonable under the police power, is valid and constitutional." Appellant, however, says, "Granted that the States may in the exercise of their police power reasonably regulate businesses affected with the public interest; granted that a building and loan association is such a business; it still does not follow that the statute in question is constitutional." It is not constitutional, appellant argues because it is not reasonable.
 In our view of the case, the major and minor premises above stated being conceded, properly so we believe, we are bound to affirm the judgment because, on the record before us, we cannot say that the regulation is unreasonable. The reduction in interest rate was not permanent during any part of the time involved. The reduction to 4 per cent, required by the statute, was for the period of the emergency only; an emergency was declared to exist; sufficient facts [37 Cal.App.2d Supp. 769] were recited to constitute an emergency; the commissioner had power to terminate it legally at any time on the occurrence of a factual termination; there is no showing or suggestion that the commissioner abused his discretion in not terminating the emergency as a matter of law or in reducing the interest rate temporarily to 2 per cent. We must presume, in the absence of evidence establishing the contrary, that facts existed justifying the commissioner's order; likewise, since there is no suggestion of evidence showing that the legislative-required reduction in interest rate from 6 per cent to 4 per cent during the emergency period was not reasonable we must presume that facts existed which warranted that action. [3] If it was based on substantial and extraordinary facts and was, with respect to those facts, reasonably calculated and necessary to protect the public welfare, it is not unconstitutional merely because it alters that which was a definite obligation of the contract in the absence of such extraordinary facts.
 In Home Building & Loan Assn. v. Blaisdell, (1933) 290 U.S. 398, 428 [54 S.Ct. 231, 78 L.Ed. 413, 423, 88 A.L.R. 1481], Chief Justice Hughes, speaking for the Supreme Court, said "To ascertain the scope of the constitutional prohibition we examine the course of judicial decisions in its application. These put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula. ... (L.Ed., pp. 426-7.) Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect'. (Stephenson v. Binford, 287 U.S. 251, 276 [53 S.Ct. 181, 77 L.Ed. 288, 301, 87 A.L.R. 721].) Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. ... (L.Ed., p. 428.) The economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts. ... (L.Ed. 429.) The question is not whether the legislative [37 Cal.App.2d Supp. 770] action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end."
 While it may be urged that the Minnesota statute involved in the Blaisdell case left to the creditor a possibility that he might ultimately recover the face value of his contract while our statute, although operating only on dividends accruing during a temporary period is permanent in its effect on those dividends, we find nothing in that factual difference (if inherently it be such) which alters the controlling legal principle. That principle is that, as expressed in one of the public utility rate cases cited in the Blaisdell case (at p. 429, L.Ed.; Union Dry Goods Co. v. Georgia Pub. Serv. Corp., (1919) 248 U.S. 372 [39 S.Ct. 117, 63 L.Ed. 309, at 312, 9 A.L.R. 1420, P. U. R. 1919C, 60]), "the right of private contract must yield to the exigencies of the public welfare when determined in an appropriate manner by the authority of the state." The case most factually similar to ours, so far as our research has led us, is that of Holland v. Nakdimen, (1928) 177 Ark. 920 [9 S.W. (2d) 307, 62 A.L.R. 484], wherein the court held that a subsequently enacted statute fixing the maximum rate of interest to be paid by banks on savings accounts was valid and effective on obligations previously contracted. That court said (pages 488, 489, 62 A.L.R.): "Finally, it is insisted that the act under consideration went into effect March 7, 1927, and that in so far as the plaintiff, Mrs. C. C. Scott, is concerned, it would violate a contract which the bank had previously made with her to pay her 4 1/2 per cent. on time deposits until June 30, 1927. When Mrs. Scott and the bank made this contract, they knew that the regulation and control of banks came under the internal police power of the state, and that this contract must be subject to all laws then in force or which might thereafter be passed." The business of a building and loan association has the same inherent qualities and characteristics in relationship to the public which bring a bank within the regulatory scope of the police power of a state. (North American Building etc. Assn. v. Richardson, (1936) 6 Cal.2d 90, 101 [56 PaCal.2d 1221].)
 The ably presented argument of appellant is not unlike the strong, but unavailing dissent of Mr. Justice Sutherland in [37 Cal.App.2d Supp. 771] the Blaisdell case. (Home Building & Loan Assn. v. Blaisdell, (1933) 290 U.S. 398 [54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481].) At page 446 L.Ed. with respect to the case of Edwards v. Kearzey, 96 U.S. 595 [24 L.Ed. 793], relative to a provision of the North Carolina Constitution of 1868 increasing the exemptions to which a debtor was entitled, Justice Sutherland said: "This court ... reviewed the history of the adoption of the contract impairment clause and held the state constitutional provision invalid. '"Policy and humanity"' it said, 'are dangerous guides in the discussion of a legal proposition. He who follows them far is apt to bring back the means of error and delusion. The prohibition contains no qualification, and we have no judicial authority to interpolate any.'" The accuracy of the cold logic of Justice Sutherland need not be questioned but it has yielded, at least in matters such as that now before us, to "policy and humanity" as exemplified in the less stern and more modern rule enunciated by the majority through Chief Justice Hughes.
 The case of Treigle v. Acme Homestead Assn., (1935) 297 U.S. 189 [56 S.Ct. 408] 80 L.Ed. 575, 101 A.L.R. 1284], so strongly relied on by appellants as "almost identical" with the case at bar is actually not in point. At page 579 (L.Ed.) the court says of the Louisiana statute there under discussion: "It does not purport to deal with any existing emergency and the provisions respecting the rights of withdrawing members are neither temporary nor conditional. ... (p. 580, L.Ed.) The provision is comparable to a statute declaring that whereas preferred stockholders heretofore have enjoyed a priority in the distribution of assets, in that respect they shall hereafter stand pari passu with common stockholders. ... The statute merely attempts, for no discernible public purpose, the abrogation of contracts between members and the association lawful when made."
 Appellant asserts "No single authority cited by respondent purports to legalize the permanent, arbitrary, cancellation of property rights dependent on a legal contract made before the statute went into effect." That statement may be fully conceded; but it is inappropriate because in the case at bar, as hereinbefore made apparent, the alteration of the contract right was neither permanent, in the sense of continuing its [37 Cal.App.2d Supp. 772] effect on contract rights accruing after the period of emergency, nor (presumptively) arbitrary.
 It would serve no useful purpose to discuss the many other authorities cited by counsel for the respective parties. None of them add measurably to the propositions of law declared in Home Building & Loan Assn. v. Blaisdell, supra, and the authorities therein cited or hereinabove discussed, upon which we rest out conclusions, and none of them overcome those propositions or hold them inapplicable to a situation such as that to which we apply them.
 The judgment is affirmed, respondent to recover its costs of appeal.
 Shaw, P. J., and Bishop, J., concurred.
 The Court.
 The petition of appellant for a rehearing after judgment of this court on appeal, in the above-entitled case, having been filed and having been duly considered, said petition is now hereby denied.